BENJAMIN E. TILTON, as Trustee of NEW YORK STATE RAILWAYS, Claimant, *v.* THE STATE OF NEW YORK, Defendant.

(Claim No. 24468.)

Court of Claims, June 7, 1939.

*Willis H. Michell* [*W. L. Broad* of counsel], for the claimant.

*John J. Bennett, Jr., Attorney-General* [*Joseph I. Butler, Assistant Attorney-General,* of counsel], for the defendant.

*John R. Walrath,* for the Syracuse Grade Crossing Commission.

*Maurice Lane,* for the New York Central Railroad Company.

GIBBS, J. This claim was filed by Benjamin E. Tilton, as trustee of the New York State Railways, to recover damages amounting to $6,615.55 from the State of New York arising out of alleged interference with franchise rights of the New York State Railways.

The Syracuse Grade Crossing Commission was created by the State of New York under the provisions of chapter 825 of the Laws of 1928, section 14 of which authorizes the Commission to close and discontinue streets temporarily and to divert travel from one street to another to carry out the purposes of the act. Pursuant to this authority the Commission passed a resolution August 20, 1934, ordering that James street and North Salina street in the city of Syracuse be closed over the right of way of the West Shore railroad during the erection of girders for bridges over said streets in connection with the elimination of the grade crossings at these points. Accordingly, from October 15, 1934, to October 23, 1934, inclusive, James street was closed, and from November 13, 1934, to November 24, 1934, inclusive, North Salina street was closed. The New York State Railways had franchises to run its cars on North Salina and James streets over the right of way of the West Shore railroad so that in closing these streets the Commission temporarily interfered with the exercise of the claimant's franchises. The claimant was obliged to lay temporary tracks on Oswego boulevard and to provide temporary bus connections to accommodate its passengers. The claimant seeks reimbursement from the State of New York of $5,600 for the expense of maintaining the temporary lines and $1,015.55 for making necessary permanent improvements where the West Shore tracks were removed. The claimant contends that the State is primarily obligated to bear the cost.

The resolution of the Commission stated that the Walsh Contruction Company, the contractor building the elevated tracks, must bear the expense of the interruption of street car service pursuant to section 11 of a contract dated December 8, 1933, between the New York Central railroad, of which the West Shore railroad is a part, and the Walsh Construction Company. The New York State Railways was not a party to the said contract and, therefore, insists that neither the resolution nor the contract has any bearing on the question of the State's liability.

The claimant relies on the common law to prove his case, since under section 9 of chapter 825 of the Laws of 1928, " If the work of such elimination causes damage to property not acquired as above provided, the State shall be liable therefor in the first instance but this provision shall not be deemed to create any liability not already existing in law." It is a common-law rule that a franchise is at all times subject to the police power of the State and when changes are required for public safety a public corporation holding a franchise must comply with requirements at its own expense. (*Transit Commission* v. *Long Island R. R. Co.*, 253 N. Y. 345; *Chicago,*

*Burlington & Quincy R. R. Co.* v. *Chicago,* 166 U. S. 226; *Chace Trucking Co.* v. *Richmond Light & R. R. Co.,* 225 N. Y. 435.)

This case is analogous to that of *Transit Commission* v. *Long Island R. R. Co. (supra).* In that case the transit commission ordered the Queens Gas Company to relocate its mains which lay beneath the highway at Bayside, New York city, so that two grade crossings could be eliminated by depressing the tracks of the Long Island railroad about twenty feet. The gas company refused to move its mains unless compensation was made for the expense, arguing that it had a franchise to run its mains beneath the highway as they were and that such a franchise could not be changed without compensation. The Court of Appeals unanimously held that the gas company must relocate its mains at its own expense as a measure of public safety.

The claimant seeks to distinguish the present case from the foregoing one on two points, viz.: It is said that the present case involves a temporary destruction rather than control of the franchise and, secondly, that the present case does not involve the exercise of police power.

By way of proving the first point, claimant cites *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago (supra).* In that case the city laid out a new street over the railroad's right of way and a jury awarded the railroad only nominal damages of one dollar for this interference. The Supreme Court held that the jury found no interference with the right of way but merely a regulation thereof and that the award was proper. Claimant argues that it is to be implied from that decision that if there were a temporary destruction of franchise rights the city would have to compensate the railroad. The case is more properly interpreted to mean that in laying out a street the city was exercising a proprietary right rather than its police power and, therefore, it would be obliged to pay for property it seized whether in the form of tangible holdings or of franchise rights. This point is more clear when we observe that in this same case the railroad was required to furnish gates and watchmen at the crossing at its own expense to protect the public.

In the exercise of proprietary functions instead of governmental functions a municipal corporation does have to bear the cost of relocating the incidents of a public service corporation's franchises. It is so held in *Transit Commission* v. *Long Island R. R. Co. (supra),* where the court says that the common-law rule that public service corporations maintain their franchises subject to control for public safety without compensation does not go so far as to place the cost of removal upon a company when the change is required on behalf

of a municipal corporation exercising its proprietary instead of its governmental functions. But the court then adds that grade crossing elimination is a governmental function.

On this same point the analogy the claimant would have us draw between this case and *City of New York* v. *Hudson & Manhattan R. R. Co.* (229 N. Y. 141) fails. There the city of New York was exercising its proprietary rights in requiring the defendant to remove its subway exits from the street so that it might be widened. The court ordered the city to pay the costs but not because it was interfering or destroying the franchise in exercise of its powers to protect the public from danger.

To prove his second point of distinction between this case and that of *Transit Commission* v. *Long Island R. R. Co.* (*supra*), claimant contends that the Syracuse Commission did not exercise any police power in closing the streets during the erection of the steel girders for the bridges over James and North Salina streets. Mr Bean, an electrical engineer employed by the New York State Railways, was called by claimant to testify on the possibilities of keeping the streets open while the girders were being placed. Mr. Bean admitted no experience in building heavy bridges, but stated that, in his opinion, there was no reason from an engineering point of view why the streets could not have remained open while the girders were being put in position. On the other hand, a civil engineer in the State's employ, one who had had wide experience with heavy bridges, testified that it would have been unsafe to keep the streets open at that time. To substantiate his opinion, he pointed out that one of the girders at the bridge over State street in Syracuse had fallen while the workmen were lifting it with a crane. The girders of State street were only one-half the weight of those at James and North Salina streets. It is apparent that even if, from an engineering point of view, the streets might have been kept open to street car traffic, from the point of view of public safety they had to be closed.

The claimant is correct in saying that the exercise of police power is strictly construed. He cites *People ex rel. City of Olean* v. *Western New York & P. T. Co.* (214 N. Y. 526) as an authority against the right of a municipality to order relocation of street car lines under the police power. That case differs from this one because no public welfare or safety was involved. The city of Olean under its authority to alter and improve its streets, ordered the street railways to change their tracks from the side of the road to the middle as a matter of convenience to the city, not for any reason of public welfare. In the present case we recognize the motive of the Commission in closing the streets involved as one of

protection of the public and we find adequate authority for its action in the act under which it was created.

As it appears that there is no material distinction between *Transit Commission* v. *Long Island R. R. Co.* and this case the claimant must bear the expenses both of the temporary lines used while the streets were closed and of the permanent improvements in repairing the crossing from which the West Shore tracks had been removed.

In so holding in relation to the permanent improvements, we are following the *Transit Commission* case and also the case of *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago (supra)*. In the former the Queens Gas Company was obliged to lay new mains at its own expense and in the latter the railroad had to furnish the safety devices necessitated by the new crossing created by the city

The claim should be dismissed on law and facts.

RYAN, J., concurs.